# EXHIBIT 4

Pages 1 - 35

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JEFFREY S. WHITE

United States of America,               )
                                        )
            Plaintiff,                  )
                                        )
   vs.                                  )   NO. CR. 07-0678-JSW
                                        )
Glenio Jesua Ferreira Silva,            )
                                        )   San Francisco, California
            Defendant.                  )   Thursday
                                        )   May 15, 2008
_____)   2:58 p.m.

### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

For Plaintiff:              Joseph P. Russoniello
                            United States Attorney
                            450 Golden Gate Avenue, Box 36055
                            San Francisco, CA   94102
                            (415) 436-7232
                            (415) 436-7234 (fax)
                      BY:   **DENISE BARTON**

For Defendant:              Steven F. Gruel, Attorney at Law
                            655 Montgomery Street, Suite 1700
                            San Francisco, CA   94111
                            (415) 989-1253
                            (415) 576-1442 (fax)
                      BY:   **STEVEN F. GRUEL**

Portuguese Language Interpreter:  Susan Howard


Reported By:   Lydia Zinn, CSR #9223, RPR
               Official Reporter - U.S. District Court

1              THE CLERK:  Calling Case Number CR. 07-678,

2    United States versus Glenio Ferriera Silva.

3              Counsel, please step forward and state your

4    appearances.

5              MS. BARTON:  Good afternoon, your Honor.

6    Denise Marie Barton, on behalf of the United States.

7              THE COURT:  How is your rehab coming?

8              MS. BARTON:  Very well, your Honor.  Thank you very

9    much.

10             MR. GRUEL:  Good afternoon, your Honor.

11   Steven Gruel, on behalf of Glenio Silva, who is present before

12   the Court, not in custody, and with the assistance of a

13   Portuguese interpreter.

14             INTERPRETER:  Susan Howard, Portuguese interpreter.

15             THE COURT:  And you have been sworn?

16             INTERPRETER:  I have, your Honor.

17             THE COURT:  All right.  So we're obviously here based

18   upon the defendant's motion for discovery regarding selective

19   prosecution, and for discovery of the identity of the

20   confidential informant in this case.

21             So I have carefully reviewed the parties' legal

22   briefs and the authorities that they rely on.  And I have a

23   couple of questions I would like to ask.  The first question

24   addressed to defense counsel is, because it's not clear from

25   the papers, exactly what is the defendant's theory of selective

1  prosecution?  Is it -- in other words, is it based upon race?

2          **MR. GRUEL:**  Well, that's an excellent question,

3  your Honor.  And I can answer it in multiple parts.

4          **THE COURT:**  All right.

5          **MR. GRUEL:**  The first answer is, yes, I think it does

6  involve a race component to it.

7          And from the limited discovery I've been able to

8  accumulate, mainly from the ICE documents themselves, it seems

9  to me that the only two criminal prosecutions I'm aware of in

10  this District for harboring that are part of the Work Site

11  Enforcement program involve a Brazilian gentleman, to my left,

12  and an Hispanic or Mexican national, Mr. Baez, who -- his

13  matter is pending before Judge Jensen, over in Oakland.

14          So -- and to add some substance to that claim,

15  your Honor, as I understand it, again, from an ICE press

16  release, as far back as 2005 there was a prosecution -- or I'm

17  sorry -- there was a Work Site Enforcement of a warehouse or of

18  a company at the Oakland port of authority, and for hiring a

19  much larger amount of illegal aliens -- about 63, I think, or

20  60-some number comes to mind; all Mexican nationals.  And, as I

21  read their press release, the only person prosecuted in that

22  case -- it wasn't an employer.  It wasn't someone associated

23  with the business, the corporation itself, but one illegal

24  alien who just happened to be someone who was previously

25  deported, and then back in the country, and found in the

1   northern district of California.

2           So I have -- from the limited items before me, I have

3   two Work Site Enforcement cases that are criminally prosecuted

4   of a non Caucasian and -- and a corporation who -- I don't know

5   who the owners are of that corporation or who the principals

6   are, I guess, of that corporation; apparently unscathed when it

7   came to the criminal-prosecution aspect of it.

8           And then I'll just add that I'm not sure what's going

9   to happen.  There was a recent ICE takedown about two weeks

10  ago; I think it was of a restaurant chain in the Bay Area.

11  And, as far as I know, there hasn't been any criminal

12  prosecution that has flowed from that.

13          So the first part of your question is, yes, I think

14  it's race based, but I think the case law --

15          THE COURT:  Is it race, or is it nationality?

16          MR. GRUEL:  Nationality.  Nationality.  Thank you for

17  that clarification.

18          THE COURT:  All right.

19          MR. GRUEL:  But the next -- I don't think it involves

20  gender.  I don't think it involves religion, but I do think

21  that there is a -- in the case law, an understanding that

22  prosecutions cannot be based on any other arbitrary

23  classification.  And I look to that as my second part of

24  your -- my answer to your question, your Honor, because what I

25  see thus far is, you know, nothing less than complete

1    arbitrariness, capriciousness with respect to the decision made

2    to criminally prosecute Mr. Silva for the alleged actions that

3    he is charged with having done.

4            And again I hearken back, first, with the Court's

5    indulgence, to my own personal experience.  I worked at what

6    used to be called "INS."  And they used to have a program

7    called "Employment Sanctions."  And the goal of that was to

8    take away the magnet of employment.  That was 1986, under the

9    Reagan administration.

10            And what we would do in these type of cases where an

11    employer -- restaurateur hired illegal aliens, what we would do

12    is fine them, because under the work site -- under employment

13    sanctions, and under -- and now Work Site Enforcement, there

14    are two ways you can enforce.  One is administratively.  Yeah.

15    There's criminally.  And back in 1986, '87, '89, we didn't

16    prosecute anyone that I can recall for this type of offense.

17    We went the straight administrative route.

18            And that's what I now -- fast-forward 20 years -- try

19    to figure out:  if that enforcement action administratively

20    still exists.  I think it does.  I think it's talked about in

21    the work site employment Web sites.

22            And what other actions have taken place --

23    administrative actions have taken place in the Bay Area out of

24    this District that -- and what criteria did they use to, on the

25    one hand, go forward and deal with someone administratively,

1    and then, on the other hand, deal with them criminally?

2            And certainly the work -- the Web site provided by

3    ICE doesn't give any guidance as to that, because their own

4    language talks about egregiousness.  They talk about, you know,

5    alien smuggling.  They talk about any type of other criminal

6    activity that warrants a criminal prosecution, as opposed to an

7    administrative action.

8            And indeed maybe this case started -- it kind of

9    segues into the next argument down the road, the next issue,

10   but this case may have started where it was believed that

11   Mr. Silva was a ringleader of smuggling.  It was believed or

12   was told to the case agent that he was someone involved in

13   getting counterfeit documents, driver's licenses, border --

14   birth certificates, all those things; but that turned out to be

15   untrue.

16           **THE COURT:**  We're getting beyond the question.

17           **MR. GRUEL:**  Okay.

18           **THE COURT:**  What's the Government's response,

19   Ms. Barton?

20           **MS. BARTON:**  A few points, your Honor.  One -- I was

21   troubled when I saw Mr. Gruel's declaration, and I'm still

22   troubled by his representation to this Court of him making

23   himself out as an expert in ICE's procedures, administratively

24   and criminally.

25           I find it somewhat difficult that counsel who is

1  representing the defendant is proffering this information based

2  on his personal experience; but moving past that, your Honor,

3  first, I think this assertion that there is a discriminatory

4  intent based on Mr. Silva's nationality is not supported,

5  either in the papers or based on what has just been presented

6  to the Court.

7           I think, as the case law is clear, the defendant has

8  to show a discriminatory application of law and a

9  discriminatory effect -- I'm sorry -- intent.

10          And I think what I am gathering is that, based on

11  Mr. Silva's nationality as a Brazilian national, there is an

12  assertion that ICE is going after Brazilians in some respect,

13  and that there has been an intent to go after Brazilians, and

14  that there has been an application of the law to go after

15  Brazilians.  And I think the facts that have been proffered do

16  not show that.  Even based on Mr. Gruel's own representation as

17  to press releases, there was a Mexican and there was a

18  Brazilian.  I think there's a 50:50 chance in the two that he

19  presented.  And I don't think there's any evidence; certainly

20  not the showing that needs to be made.

21          I also think that the case law -- and I'm speaking

22  specifically to the Turner Ninth Circuit case on point, and

23  Armstrong, the Supreme Court case on point.  Frankly,

24  your Honor, these circumstances are similar.  Those were both

25  cases where the penalties concerning crack prosecutions were

1  being challenged, saying that they were going predominantly

2  after minorities and African Americans.  And it was largely

3  based on the effect and studies that were showing that

4  blacks -- that African Americans were generally prosecuted.

5       I think those cases in which the Court held -- the

6  courts held there was not a basis for discovery.  Frankly,

7  there was a more evidence per se in those cases than there is

8  here.  We just have here two press releases and a Web site as

9  the evidence that the defendant is proffering.

10      As far as the other assertion, that, I think, is not

11 an equal-protection challenge, which I think is required here

12 under the law -- just that there seems to be a unique

13 circumstance where this case is being prosecuted, when it may

14 not have been in another era, I think --

15      **THE COURT:**  Well, let me ask you this.  If, in

16 fact -- if I accept the representation that this restaurant was

17 raided, and Mexican nationals were arrested, but then not

18 prosecuted, would that be sufficient to meet the burden under

19 *Armstrong*?

20      **MS. BARTON:**  I do not think so, your Honor.

21      **THE COURT:**  Why not?

22      **MS. BARTON:**  I think, your Honor, one instance where

23 somebody was or was not prosecuted doesn't meet the standard

24 which had been represented to be a demanding one.  The standard

25 that applies here, your Honor, is that the defendant must

1  present specific facts; not mere allegations.

2          And here there needs to be some evidence showing the

3  existence of the essential elements of the defense; one which

4  is discriminatory effect, and the other which is discriminatory

5  intent.  And I don't think the raiding of one instance where

6  people may not have been prosecuted makes that showing.

7          I also note, your Honor, that there are -- well, I'll

8  leave it at that.

9          **THE COURT:**  All right.  Anything further on that?

10         **MR. GRUEL:**  Yeah.  Two points.  Very first page of

11  the government's discovery, your Honor, says -- first of all,

12  they call it "Brazilian overstays."  It doesn't say, "overstays

13  by illegal aliens."  It says "Brazilians."

14         And it says since late 2006 -- now I'm

15  paraphrasing -- special agents in San Francisco have been

16  investigating Brazilian citizens who have entered the

17  United States and violated the conditions of their nonimmigrant

18  status.  So it's clear that --

19         **THE COURT:**  What's wrong with that?  Why does that

20  show arbitrary --

21         **MR. GRUEL:**  I think she made the reference that this

22  just happened.  There's no intent or no -- no intention that

23  this was going -- on Brazilians per se.  That's how I read it.

24  I mean, it does seem to include that phrase.

25         **THE COURT:**  All right.  What's your answer to that?

```
 1         MS. BARTON:  This case did involve Brazilians.  We
 2   couldn't call them Mexicans because they weren't.  I think it
 3   would have been the same if there had been Algerians.  It would
 4   have used that to describe them.  That does not show intent
 5   with discriminatory nature.
 6         MR. GRUEL:  The final point, your Honor.
 7         THE COURT:  Yes.
 8         MR. GRUEL:  I think what I would say to the Court and
 9   to counsel about whether or not there's been a showing, you
10   know, when you have these type of case, you know full well.
11   You understand that there's a high hurdle that has to be
12   overcome, but you have to start somewhere.  I mean, I can't
13   begin to -- if this is one of three cases, what do I have to
14   look back to to make that showing, other than what has happened
15   previously that's not in a criminal court, but is in an INS
16   court, or being dealt with administratively?  I don't know if
17   those are public records or no not.  I don't think they are.
18         And so how can I make a showing on something that --
19   how do I prove a positive, when I don't know what exists in
20   that universe?  It has to start somewhere.  And this is, I
21   think, that first step.
22         THE COURT:  All right.  I'll give you the last word
23   if you wish, Ms. Barton.
24         MS. BARTON:  Your Honor, I think the papers are clear
25   that the fact that the defendant needs discovery in this
```

1   case -- directly on point to what Mr. Gruel just addressed, the

2   fact that he does need discovery to prove his point is not a

3   basis to obtain the discovery that he's seeking.

4        THE COURT:  All right.  Well, the parties -- I won't

5   restate the facts that the parties rely on, because I think the

6   papers adequately describe the facts.  And, as the parties

7   alluded to, in order to obtain discovery that defendant seeks

8   that relates to selective prosecution, the defendant must

9   provide, quote, "some evidence tending to show the existence of

10  the essential elements of the claim"; namely, discriminatory

11  effect and discriminatory intent.  And that's the *Armstrong*

12  case.  That's the citation of -- which is in the parties'

13  papers.

14       And in *Armstrong*, the Supreme Court held that with

15  respect to the discriminatory-effect element in a case of

16  selective prosecution based upon race, this requires a

17  defendant to put forth some evidence that, quote, "similarly

18  situated defendants of other races could have been prosecuted

19  but were not."  End quote.  And that's at 469 of that case.

20       The Court also noted, however, that, quote, "The

21  justifications for a rigorous standard for the elements of a

22  selective prosecution claim require a correspondingly rigorous

23  standard for discovery in aid of such a claim."  End quote.

24  And that's *Armstrong* at page 468.

25       In the *Turner* case, which the parties referred to in

1  their papers -- the citation is in their papers -- the Ninth

2  Circuit noted that, quote, "The threshold requirement to obtain

3  discovery on the weight of providing a selective prosecution

4  defense," quote, "must relate to the defense to be proved."

5        Now, the defendant clarifies today that his theory in

6  response to the Court's question is -- his theory of selective

7  prosecution is based upon a -- is based upon discrimination

8  based upon nationality.  The Court finds that the defendant

9  does not meet his burden to establish a right to discovery.

10  And the reasoning is as follows.

11        In the *Armstrong* case, the defendant relied on an

12  affidavit that stated that, quote, "In every one of the 24

13  U.S.C. Section 841 or 846 cases closed" -- end quote -- by the

14  prosecutor's office, the defendant was black.

15        The defendant also submitted what was characterized

16  as a study with the affidavit.  That listed the 24 defendants

17  and their race.  The Supreme Court concluded that this study,

18  quote, "did not constitute some evidence tending to show the

19  existence of the essential elements of a selective prosecution

20  claim."  And that's at page 470.

21        Specifically, the Court found that, quote, "The study

22  failed to identify individuals who were not black and could

23  have been prosecuted for the offenses for which respondents

24  were charged, but were not so prosecuted."  End quote.

25        Similarly, in the *Turner* case, the defendants also

1  relied on statistical evidence to support a race-based

2  prosecution claim.  And the Court found it insufficient to

3  establish a right to discovery.  And that's *Turner* at pages

4  1,184 through -85.

5           In this case, the defendant attests that the

6  United States Attorney's Office has chosen to prosecute only

7  three Work Site Enforcement cases.  And notwithstanding that,

8  and notwithstanding the offers that are made today by Counsel,

9  the defendant has not put forth any evidence regarding those

10  cases it has -- that the Government has chosen not to

11  prosecute.

12           Instead, the defendant appears to rely on the

13  description of the Work Site Enforcementment program, and

14  contends that this case and the other cases that have been

15  prosecuted do not fall within its parameters.  Thus, even if

16  the defendant's theory is that the Government is acting in an

17  arbitrary fashion with respect to the prosecution of these

18  types of cases, the Court -- the record still fails to show

19  evidence showing the manner in which the Government acted

20  arbitrarily.

21           And finally, if the evidence in the *Armstrong* case

22  was not sufficient to entitle the defendant to discovery, the

23  Court cannot conclude that the evidence that this defendant

24  offers in this case would be sufficient.  Therefore, the Court

25  finds that the defendant has not presented sufficient evidence

1   to meet the standard required in *Armstrong*, and the motion for

2   discovery is denied.

3          Now I want to move on to the motion for discovery of

4   the identity of the informant.  And I have a question for the

5   Government, which is the following.  How does the Government

6   respond to Mr. Gruel's declaration, in which he attests that

7   the informant identified as SA-1180-SF provided ICE with

8   defendant's books and other information about the defendant?

9   And that's in Mr. Gruel's declaration at paragraphs five

10  through six.

11         MS. BARTON:  I think that statement is ·true, is my

12  first response.  And I think that statement was derived from

13  the discovery that was produced to Mr. Gruel in the course of

14  discovery.

15         I think, however, it still does not change the notion

16  that this identity should not be disclosed.

17         THE COURT:  I'm not asking for that argument yet.

18         MS. BARTON:  The reason why, your Honor, is that I

19  think whether somebody is providing oral information or

20  providing written documentation, it is the same as if this

21  person was a tipster.  They were not directly involved in the

22  conduct that was charged.  They were just providing information

23  that allowed ICE to continue with an investigation.

24         I know Mr. Gruel in that point in his papers claimed

25  that because the books were provided by somebody, there would

1  be a chain-of-custody issue.

2        Well, I think all the people in this courtroom know

3  that chain of custody goes to the weight, not the admissibility

4  of the evidence.  So, should that become an issue at trial, it

5  can be something that is raised with respect to the

6  significance and the weight of the evidence; but I think the

7  information and the fact that somebody was the water boy,

8  essentially, from one person to another does not make that

9  person relevant or essential to the defendant's case.

10        THE COURT:  Well, Mr. Gruel, let me ask you to

11  respond and expand your answer to include this question.  On

12  what basis does the defendant contend that the informant would

13  be relevant and helpful to his defense?

14        MR. GRUEL:  Um.

15        THE COURT:  Because that's the standard.

16        MR. GRUEL:  Okay.  Yes.  And I think in my reply to

17  the Government, your Honor, I think I address that, and mainly

18  as impeachment evidence, as I think -- as I understand -- I'm

19  going to go out on a limb here.  I understand that a water boy,

20  as the Government referred to, may be a Government witness in

21  trial.  It may be one of the people who was allegedly harbored,

22  or may be the identified informant, Silvano Santos.

23        So my guess -- my argument, your Honor -- and I can

24  be disavowed of this, but I think the water boy came forward,

25  told much more about Mr. Silvano, much of which was untrue, as

1  we've learned, and probably gave him that book or books of

2  ledgers or what have you, and had that passed on to the case

3  agent.

4        THE COURT:  But are you contending -- I don't think

5  there's anything in the record from which this Court can

6  conclude that this confidential informant participated in the

7  crime or may be the sole witness to the crime.

8        MR. GRUEL:  That's the Government's representation.

9  I don't have anything to disagree with that.

10        THE COURT:  But isn't that your burden?  Don't you

11  have to show that?

12        MR. GRUEL:  No, I don't think so, your Honor.  I

13  mean, if I note for -- if I -- if I -- I mean, again, the

14  Government has to make a choice, many times, with respect to

15  informants.  Either they don't reveal them, and they -- and

16  they deal with any possibility of exclusion of evidence, or

17  they do reveal them, and they don't have to worry about the

18  exclusion.

19        There's no issue here about the safety of this

20  individual, in my opinion, your Honor.  And what the facts

21  show, as I understand them, is that he was an individual

22  conveying documentary evidence, and also conveying a message

23  about what -- who and what Mr. Silvano was up to.

24        Now, if the Government counsel could tell me that

25  that has nothing to do with one of its anticipated witnesses,

1   then, case closed.  I guess then you're right.  And there's

2   nothing I can do about it.  And they can go ahead and keep

3   their informant from being disclosed.

4           But if one of the witnesses they're going to call at

5   trial was an individual who told this information to

6   SA-1180-SF, and it turns out to be completely false, I should

7   have the ability to call that person -- that undisclosed

8   informant -- to the stand, and impeach that potential witness,

9   because someone's lying, is what it boils down to.

10          Either the --

11          THE COURT:  There's no doubt that if the scenario you

12  mentioned is true, that this -- the identity would be helpful,

13  but that would not necessarily make this person that you're

14  hypothesizing a participant in the crime or the sole witness to

15  this crime, right?

16          MR. GRUEL:  I don't believe the person was a

17  participant.  Well, I don't know.  I assume not.

18          THE COURT:  But accepting your hypothetical or

19  inference -- I won't call it "speculation."

20          MR. GRUEL:  Yes.

21          THE COURT:  -- it doesn't sound like it amounts to an

22  argument that this was a percipient witness or, much less, that

23  this was a participant or a sole witness to this crime,

24  correct?

25          MR. GRUEL:  Correct.

1         THE COURT:  What's your response?

2         MS. BARTON:  My response, your Honor, is I think that

3    the Government has made it clear, as was just indicated, that

4    this was not a percipient witness.  This witness does not have

5    direct information.  And I think impeachment purposes alone is

6    not something that would be relevant and necessary to the

7    impeachment -- I mean -- wait a minute.  Let me back up for a

8    second.

9         Impeachment as to another potential Government

10   witness is not something that would meet the standard, as is

11   required under the case law.

12        And I know your Honor --

13        THE COURT:  If it did, wouldn't it come under *Brady*,

14   as exculpatory evidence?

15        MS. BARTON:  I think -- well, certainly if there is

16   any exculpatory information, it would be disclosed.  And we

17   would have that obligation and meet that obligation.  Frankly,

18   knowing the facts as I do, I can't conceive of any circumstance

19   under which the identity of that person would be *Brady* material

20   as to any of the currently intended Government witnesses.

21        I think, your Honor, this circumstance that Mr. Gruel

22   is arguing has been squarely addressed.  I believe it's -- I

23   believe it's the *Henderson* case, where there was a witness --

24   there was -- yeah, it was the *Henderson* case.  *U.S. v.*

25   *Henderson*, 241 F. 3d., 638.  And it speaks specifically to --

1  your Honor, the defendant in that case came to the attention of

2  the law-enforcement authorities after his picture had been

3  broadcast in connection with an *America's Most Wanted* program.

4  And somebody called in; gave a tip; gave information that led

5  the FBI to this person.  He was subsequently prosecuted in

6  connection with several bank robberies.  That information --

7  that person provided information that assisted in a

8  prosecution.

9          The defendant in that case wanted information as to

10  the informant to see if there was some nefarious purpose that

11  the person had provided information that could assist him.  And

12  the Court squarely held, your Honor -- this was the Ninth

13  Circuit in 2001 -- held that regardless of the evil motives of

14  this informant, it would not have explained away the most

15  convincing evidence of the defendant's guilt.

16          And I think in this case what the evidence that had

17  been provided in discovery -- it has not been a small amount.

18  And the evidence that will be presented at trial would show, by

19  means of statements, by means of witnesses, by means of

20  documents, that Mr. Silva was employing people and allowing

21  them to live at his property, when he knew that they were

22  illegal.

23          The fact that somebody may have provided books to

24  somebody and there may have been some odd relationship doesn't

25  bear on the essential elements of this case.

1    THE COURT:  All right.

2    MR. GRUEL:  Well, I think the case she just cited is

3  extremely factually much, much different and distinguishable

4  from the facts here.  We don't have some sort of tipster or

5  somebody just calls in and reports something.  And this is

6  obviously much different, where somebody came in over time and

7  sat down and actually brought evidence to the agent.

8        The bottom line, I think, your Honor, is this.  And I

9  have no faith that -- frankly, that I'm getting all my *Brady*

10  material, but I think frankly that what you're going to have in

11  this particular case are going to be witnesses, because we've

12  seen it.

13    THE COURT:  Wait.  I'm not going to let that go

14  unchallenged.  If you feel that's true, then you need to make

15  your record at the appropriate time.

16    MR. GRUEL:  I'll state it now, if I may, your Honor.

17  I have found out that there have been -- witnesses testified in

18  these material-witness depositions we've had thus far.  They

19  have been all over the board in saying what either Mr. Silva

20  knew or didn't know.  And I know for a fact that probably the

21  main informant that they've disclosed in this case is

22  Silvano Santos, who has a huge axe to grind against Mr. Silva.

23        And that action includes going to the Labor

24  Department and trying to get back wages against him to the tune

25  of about 170-some-thousand dollars.

1        Well, we went to a hearing before the State of

2   California, and we won.  They found that he was an employer;

3   not Mr. Silva.  That's something that may or may not work

4   itself into the criminal trial in this case.

5        I believe that Mr. Santos -- Mr. Santos, the

6   informant that has come forward with ulterior motives, is

7   coming forward; is --

8        **THE COURT:**  Wait a minute.  Didn't you suggest that

9   in the motion?  The Government swore that it was not or

10  asserted that it was not him.  And I understand that, from your

11  papers, you have accepted that representation.

12       **MR. GRUEL:**  Maybe I'm being confusing.  No.  There

13  are at least two informants in this case.  One of them is the

14  undisclosed individual we're talking about.  The other

15  individual is Mr. Santos.

16       Mr. Santos has filed two lawsuits against Mr. Silva

17  and, frankly, is one of the most important witnesses for the

18  Government in its case.  His two lawsuits dealt with a claim

19  that he was battered by this individual, which was not accepted

20  by the District Attorney.  There was no prosecution; but when

21  he appeared at small-claims court down the street to deal with

22  that lawsuit, he appeared with someone who I believe to be an

23  informant for the Government.  And, quite frankly, it might

24  even be SA-1180-SF.

25       I think that when the jury gets this case, with all

1  the different stories we've been hearing, with all the ulterior

2  motives that Mr. Santos may have to get Mr. Silva, that it may

3  include telling a story either, you know, knowingly, or telling

4  a story about who he is and what he was involved in to entice

5  ICE to take a look at him.

6          THE COURT:  But aren't we going for -- I mean, you

7  did respond to the Court's question about the alleged

8  compliance with *Brady* obligations, but what does that have to

9  to do with this motion to disclose the informant?

10          MR. GRUEL:  How else can I prove that Mr. Santos, the

11  known informant, may be involved in telling stories and lies

12  and providing impeachment material to an individual who may

13  have gone into ICE and provided the book, told stories about --

14  you know, about what Mr. Santos was or was not involved in?

15          And keep in mind, if I may, your Honor, what --

16  Mr. Santos used to work at Monterey Pizza.  He left in December

17  of 2006.  He took with him a book that dealt with the

18  employment situation at Monterey Pizza.  That book, I believe,

19  is the same one that was then provided to the unknown informant

20  who walks over to ICE.

21          Maybe -- maybe I'm not being clear.  And I apologize.

22          THE COURT:  I understand your point.

23          What's your response, Ms. Barton?

24          MS. BARTON:  A few, your Honor.

25          First of all, I am highly offended by the

1  scorched-earth policy in the assertion that I am not providing

2  *Brady* material.

3         THE COURT:  First of all, I don't want to hear that

4  kind of response.  I asked a question that --

5         The allegation was made.  You know, we'll deal with

6  the allegation at the appropriate time.  I don't think it's

7  necessary or appropriate to be personally offended or

8  professionally offended, because I have nothing before me.  And

9  if there -- if there's a perceived *Brady* issue, then it will

10  come up at the appropriate time.  This is not the time.

11         MS. BARTON:  If I may respond to the specific *Brady*

12  violations that Mr. Gruel did raise to the Court just now --

13         THE COURT:  Right.

14         MS. BARTON:  One:  the book.  It has been disclosed.

15  So this mysterious book that had been issued has been produced

16  in discovery.  Mr. Gruel has had it since the inception of this

17  case after his client was charged.

18         Two:  the labor disputes that Mr. Santos had been

19  involved in -- that is not something that is in my custody,

20  care, or control.  I have no obligation to go out to the Labor

21  Board and seek out law enforcement or seek out other civil and

22  administrative lawsuits.

23         In fact, I have no doubt that Mr. Gruel has those

24  documents in his possession and has been using them, because I

25  know that he has been pressing --

1    THE COURT:  We're getting far afield.  And you don't

2  need to respond because, again, *Brady* is only relevant if

3  there's some showing of prejudice.  And if that is when it

4  happens, I will deal with it; but I want -- you know, I allowed

5  this argument to get a little bit far afield, so -- but do you

6  have anything more to say on the motion?

7    MS. BARTON:  On the motion, your Honor?  No.  I

8  think, frankly, the upshot of it -- and I think it's clear in

9  my papers -- is that the defendant has not made a showing.  He

10  indicated in response to the Court's question that he didn't

11  think he did have the burden.

12    Well, the case law is square.  He does have the

13  burden to show that.  And it's a minimal threshold.  I know

14  that, but he does have a minimal-threshold showing.  And he

15  must do more than make conclusory statements that information

16  could be helpful or is based on mere suspicion.  The *Damico*

17  case, 466 F. 3d. 996, and several other cases that were cited

18  in the Government's papers -- I think, frankly, what's here is

19  just conclusory allegations and just suspicion on behalf of the

20  defendant.

21    I think this defendant has not shown that it would be

22  relevant and helpful or essential -- either one would

23  qualify -- and that it certainly doesn't override the interests

24  of the Government in protecting access to information.

25    THE COURT:  All right.  Anything further?

1        MR. GRUEL:  I guess, your Honor, the only thing I

2    would add to that is if this matter goes to trial and witnesses

3    are asked whether they provided information to someone who then

4    walked in to ICE, and the answer I get is -- I'm trying to

5    speculate -- is something that is favorable to the defense in

6    some fashion, I don't know what -- what reversible error that

7    might create.  I don't know what requests it might create for

8    me to ask for some sort of extension of time.

9        THE COURT:  Well, I would suggest the following.

10   Let's deal with this motion.  And we certainly will have enough

11   time and process to deal with any with perceived withholding of

12   evidence to go forward, because I don't want a mistrial.  I

13   certainly don't want to commit reversible error; but that's not

14   really before me now.

15       The matter as to the motion for disclosure of the

16   confidential informant is submitted.

17       And the legal standards which apply here is that the

18   Government has a limited privilege to withhold an informant's

19   identity under *U.S. versus Spires*, which cites *Roviaro*.  All

20   these cases are -- unless I mention otherwise, are contained in

21   the Government -- in the Government and the defendant's papers.

22       When determining whether to grant a motion to

23   disclose the identity of an informant, the Court must balance,

24   quote,

25           One, the extent to which disclosure

1        would be relevant and helpful to the

2        defendant's case; and, two, the

3        Government's interest in protecting the

4        identity of a particular informant.  In

5        making this determination, the Court must

6        consider the public interest in protecting

7        the flow of information against the

8        individual's right to prepare his defense.

9        End quote.  And that's also under *Spires*.

10        "The burden of proof" -- quoting now -- "is on the

11   defendant -- defendants to show need for disclosure."  End

12   quote.

13        And I'm citing *United States versus Sai Keung* --

14   K-e-u-n-g -- *Wong*, 886 Fed. 2d. 252 et. 256, Ninth Circuit,

15   1989 case.

16        Moreover, quote, "A mere suspicion that the

17   information will prove helpful will not suffice to demonstrate

18   a need for disclosure."

19        And that's *United States versus Roland*, cited by the

20   Ninth Circuit in 2006, citing other cases.

21        The Ninth Circuit has held that a district court

22   abuses its discretion if it does not hold an *in camera* hearing

23   on disclosure where the defendant makes a, quote, "minimum

24   threshold showing" -- end quote -- that disclosure of the

25   defendant's identity would be relevant and helpful to a

1  possible defense at trial.  Citing *Spires* at pages 1,238 to

2  -39.

3          However, the Ninth Circuit has also held, in the

4  *Henderson* case that counsel has alluded to here, that an *in*

5  *camera* hearing is not necessary where the potential defense

6  fails to explain all of the evidence against the defendant.

7          Disclosure of an informant's identity may be

8  necessary when the informant participated in or instigated the

9  charged crime.  I mean, that's *Roviaro* at page 65.

10         Similarly, disclosure may be necessary where probable

11  cause for search was based solely on the information provided

12  by the informant, and the constitutionality of the search is at

13  issue.

14         And most of the cases, according to *Roviaro* -- cited

15  in *Roviaro* -- *Roviaro* explained that most of the cases where

16  the Court finds it necessary to disclose an informant's

17  identity have arisen where the legality of a search without a

18  warrant is an issue, and the communications of an informer are

19  claimed to establish probable cause.

20         In contrast to the *Roviaro* case and the authorities

21  cited, disclosure of an informant's identity generally is not

22  necessary; not necessary where the informant did not

23  participate in the crime, is not the sole witness to the crime,

24  and probable cause is not an issue.

25         That's under *Roland* and *Williams*.

1    In *Roland*, an informant notified drug enforcement

2 agents of a plan to smuggle methamphetamine from Hawaii to

3 Guam.  The Court held that disclosure of the informant's

4 identity was not necessary, because the informant did not

5 participate in the crime.  The truth of the informant's

6 testimony was not specifically challenged.  And mere suspicion

7 that identification of the informant might help the defense is

8 not sufficient, quote, "to go on a fishing expedition into the

9 informant's background."  And that is *Roland* at page 909.

10    And the facts in *Williams* are similar.  In *Williams*,

11 the Court held that disclosure of an informant's identity was

12 not necessary where the informant did not participate in the

13 crime, and the only reason for disclosure was the speculative

14 assertion that the informant would be useful to impeach other

15 testimony.  And that is one of the arguments being made here

16 today.

17    The defendant, Mr. -- defendant's counsel attests in

18 his declaration that the informant provided ICE agents with

19 defendant's accounting books and updated personal information

20 about the defendant.  And that's Mr. Gruel's declaration at

21 paragraph six.  Thus, the defendant contends that the informant

22 is more than a tipster, and actually is a percipient witness.

23    However, defendant's files suggest that the informant

24 was a participant or the sole witness to the crimes with which

25 defendant is charged.  Nor does the defendant articulate how

1  the informant would be relevant or helpful to his defense at

2  trial, other than by statements which amount to mere

3  speculation.

4          Although Agent Purfeerst -- P-u-r-f-e-e-r-s-t --

5  attests that the informant has not met defendant and has no

6  direct dealings with defendant, Agent Purfeerst does not refute

7  Mr. Gruel's statement that the informant provided the

8  Government with defendant's books.  And the Government again

9  concedes that today; but even if this is true, it does not

10  necessarily suggest that the informant was a participant in the

11  crime, rather than a mere tipster.

12          So I conclude that the defendant has failed to carry

13  his burden, either to entitle him to an *in camera* hearing or to

14  know the identity of the informant.  And so -- or to disclose

15  the identity of the informant.  Therefore, the motion for

16  disclosure of the identity of the informant is denied.  And the

17  Court believes that it's not appropriate to have an *in camera*

18  hearing.

19          So, with those motions being resolved, are we ready

20  to set a trial date?

21          **MR. GRUEL:**  Well, if you recall, your Honor, the last

22  time we were before the Court I raised two points.  One is I

23  wanted to have two waves of motions.  First, we just dealt with

24  the first wave.

25          **THE COURT:**  Right.

1    MR. GRUEL:  The second wave is I do want to bring to

2    the Court several substantive motions.

3         And I would also remind the Court that when I last

4    was here, I mentioned to the Court that I have a trial before

5    Judge Weir starting August 19th.

6         THE COURT:  I recall that.  Yes, I recall that.

7         MR. GRUEL:  The good news is one of the -- there are

8    several defendants in the case.  One of them has pled, too, so

9    it's going to be a shorter trial; but unfortunately, he's also

10   coöperating against my client.  So it's going to be a much more

11   difficult task.  So with your permission -- what I was

12   wondering, your Honor, is whether I would have -- could have

13   the necessary time to prepare this second wave of motions,

14   which I think are going to deal with a motion to suppress.

15   It's a statement by Mr. Silva, a motion to dismiss the case --

16   the indictment for selective prosecution.

17        And I had one -- I think I had one more substantive

18   motion, but it just escapes me right now.  It was going to be

19   more than just one motion.  And I -- I would like as much time

20   as possible, with the understanding that I am preparing for a

21   trial before Judge Weir, but I also know the Court likes to

22   move its calendar, so I'm somewhat at your Honor's mercy.

23        THE COURT:  Well, give me a proposal and --

24        MR. GRUEL:  Okay.

25        THE COURT:  -- I'll ask the Government's response,

1 and then we'll see how a reasonable I can be.

2          MR. GRUEL:  Well, latter part of the first week of

3 June I have to -- my mother has a medical issue that requires

4 me to go back, so I'm not going to be around at all for that

5 whole week.  I would ask for, your Honor, June -- June 30th to

6 file these motions.  I don't know if that's --

7          THE COURT:  Well, let me ask what the Government's

8 position is.

9          MS. BARTON:  As far as the timing, actually, I don't

10 have a problem with the timing suggested by Mr. Gruel, you

11 know.  I'm actually out of the district for a work-related

12 conference the first week in June.  And I'm on trial the third

13 week in June.  So his timing -- I think if it works with his

14 schedule --

15          THE COURT:  Sounds like --

16          MS. BARTON:  One thing we might agree on today.

17          THE COURT:  All right.  So let's say all additional

18 motions -- and these will be the final.  This is the final

19 wave?

20          MR. GRUEL:  I believe so.

21          THE COURT:  All right.  The final wave of motions by

22 the 30th of June to be filed.  And how much time to respond?

23          MS. BARTON:  Your Honor, I typically would ask for

24 two weeks, but depending on the nature of the motions, I may

25 need more time than that.

```
 1              THE COURT:  Well, I'll give you three weeks, since
 2   we're giving a substantial amount of time.
 3              MS. BARTON:  I would appreciate that.
 4              THE COURT:  Also, it works to Mr. Gruel's benefit.
 5   So three weeks hence, Ms. Ottolini.
 6              THE CLERK:  Would be July 21st.
 7              THE COURT:  And a week later for your reply.
 8              MR. GRUEL:  Formidable arguments from Ms. Barton
 9   always, your Honor.  So I would prefer to have two weeks, if I
10   may.
11              THE COURT:  Two weeks for reply?
12              THE CLERK:  August 4th.
13              THE COURT:  And then hearing, I would say, two weeks
14   later.
15              THE CLERK:  Excuse me.  August 21st at 2:30 p.m.
16              THE COURT:  When is your actual trial?
17              MR. GRUEL:  Starts the 19th.  And it's going to be
18   about a month.  And that's the Government's projection.  I'm
19   trying to recall whether Judge Weir only goes in the morning.
20   I've had a trial before, and he went from --
21              THE COURT:  Let's do this.  Let's set it.  And then
22   the easiest thing to move is the hearing date.  So let's set it
23   for two weeks thereafter.  And we'll see if we can work with --
24   Judge Weir is very good, as all the members of the Court are,
25   in accommodating each other's schedule.  So especially if it's
```

1   going to be a long trial, I'm sure he'll accommodate it.

2            If not, we can move it.  We'll get everybody together

3   and talk about it.  So, Ms. Ottolini, two weeks after the last

4   brief for the last hearing?

5            THE CLERK:  August 21st, 2:30 p.m.

6            THE COURT:  We can always move that.

7            MR. GRUEL:  I vaguely recall that we might be before

8   the judge even before that date, your Honor.  I can raise that

9   with him, and see if he'll let me come up here that afternoon.

10           THE COURT:  All right.  If it's a problem, let us

11  know.  Maybe you can work out a stipulation with the Government

12  counsel.

13           THE CLERK:  I just -- time is excluded between now

14  and June, the filing of the next wave of motions?

15           THE COURT:  Would you agree with that?

16           MR. GRUEL:  I agree with that, your Honor.  The case

17  remains complex.  And for effective preparation by counsel for

18  these upcoming motions, I stipulate that there's excludable

19  time under the Speedy Trial Act.

20           And I would add one other thing, your Honor.  As the

21  Court recalls, you asked whether this was going to be -- if

22  this was the end of motions; if that's the second wave.  I

23  don't know if we would call them motions or not, but we've had

24  three material-witness depositions.  And the understanding had

25  been to make those matters go quickly and effortlessly,

1  everyone, in essence, has reserved their objections.  So should

2  the matter go to trial, we'll probably be coming before the

3  trial with those depositions.

4       THE COURT:  I would imagine that would happen in the

5  pretrial -- I allow for that in the pretrial.  The only

6  observation I would make about one of the things you said,

7  Mr. Gruel, which was the motion with respect to dismiss based

8  upon selective prosecution.  I know that you need to file a

9  motion.  I know that you may need to file the motion to protect

10  the record, but I want you to be mindful of the standards that

11  the Court has set forth in connection with the motion, and even

12  though you may disagree --

13       MR. GRUEL:  I understand.

14       THE COURT:  -- I think certainly you can make your

15  point for appeal purposes if you need to, but I want you to be

16  mindful of at least the Court's view of the law in this area.

17       MR. GRUEL:  I would not waste your Honor's time or

18  the Government's time with a frivolous motion, your Honor; but

19  you hit it on the head.  And that is I've got to protect the

20  record.  And I don't think having discovery denied on that type

21  of motion necessarily protects it substantively.

22       THE COURT:  No.  I understand that, but it goes to

23  how -- the way it's presented and how it's prosecuted -- the

24  motion, that is.

25       Yes, Ms. Barton.  You look --

1    MS. BARTON:  No, no, no.  I have no questions.

2    THE COURT:  Okay.  Anything further?

3    MR. GRUEL:  No.

4    MS. BARTON:  No, your Honor.  I'll prepare an order

5    in accordance with the Court's statement and stipulation.

6    THE COURT:  All right.  Thank you.

7    THE COURT:  On what?

8    MS. BARTON:  Time exclusion.

9    THE COURT:  Thank you very much.  Thank you, sir.

10    (At 3:42 p.m. the proceedings were adjourned.)

11              -   -   -   -

## CERTIFICATE OF REPORTER

I, LYDIA ZINN, Official Reporter for the United States

Court, Northern District of California, hereby certify that the

foregoing proceedings in CR 07-0678-JSW, United States of

America v. Glenio Jesua Ferreira, were reported by me, a

certified shorthand reporter, and were thereafter transcribed

under my direction into typewriting; that the foregoing is a

full, complete and true record of said proceedings as bound by

me at the time of filing.

The validity of the reporter's certification of said

transcript may be void upon disassembly and/or removal

from the court file.

/s/ Lydia Zinn, CSR 9223, RPR

Thursday, June 19, 2008

_Lydia Zinn, CSR, RPR_
_Official Reporter - U.S. District Court_
_(415) 531-6587_