# EXHIBIT 2

### BRAZIL IS A DANGEROUS COUNTRY FOR CHILDREN AND U.S. CITIZENS

Conditions for children in Brazil are horrible. The State Department Country Reports on Human Rights Practices reveals that child abuse and trafficking in children is a serious threat, with "authorities [estimating] that thousands of women and adolescents were trafficked, both domestically and internationally, for commercial sexual exploitation.... sexual exploitation and child prostitution [remains] a significant problem throughout [Brazil]." (See attached Country Reports on Human Rights Practices). In addition, over 2.23 million children under age 15 work illegally, almost 39% of Brazil's children live in poverty, and an estimated 1.1 million children ages 7 to 14 are not attending school (see attached Country Reports on Human Rights Practices).

Overall, crime is on the rise in Brazil. The major cities of Brasilia, Rio de Janeiro, and Sao Paulo have all seen an increase of armed robberies, car jackings, and pickpocketing. In addition, the State Department's Consular Information Sheet reports that U.S. citizens are being "openly target[ed]" by Columbian terrorist groups for kidnappings (see attached), putting both Mrs. Silva and her daughter at risk.

### MARISSA IS MRS. SILVA'S ONLY CHILD

Mr. and Mrs. Silva's daughter Marissa was born on May 29, 2002 in Hayward, California. (See attached copy of Marissa A. Silva's birth certificate). Mrs. Silva's close-knit family members have bonded with Marissa and Mrs. Silva greatly desires that Marissa be raised around her family. Marissa's maternal grandmother visits often and Mrs. Silva's sister, brother-in-law, and their three children visit on a weekly basis. Mrs. Silva's medical condition prohibits the Silva's from having any more children. Because Marissa will be an only child, it is of paramount importance to the Silva's that Marissa have the opportunity to be raised around her young cousins.

### MRS. SILVA IS A DIABETIC

In addition, Mrs. Silva has been diagnosed with a serious medical condition, diabetes. Mrs. Silva's diabetes requires that she remain under the constant care of an endocrinologist. Mrs. Silva is currently under the care of Dr. Pearl G. Wu, of Hayward Medical Center. Dr. Wu confirms that the necessary medication to keep Mrs. Silva's condition stabilized is not always available in Brazil (to follow). Because Mrs. Silva's pancreas no longer manufactures insulin, she is dependent on insulin shots. The World Health Organization has listed insulin as an essential drug. Without insulin, Mrs. Silva's diabetes could prove fatal. In Brazil, insulin is extremely expensive, a vial costing about 20 percent of the average worker's income in Brazil. In addition, the World Health Organization estimates that only 20% of Brazil's population has access to primary health care.

### MRS. SILVA'S DIABETES HAS RENDERED HER UNCONSCIOUS

In the past year, Mrs. Silva has had numerous serious diabetic episodes. In the past year, on three separate occasions, Mr. Silva had to place emergency calls and have paramedics revive Mrs. Silva from diabetes-induced unconsciousness. Because of the severity of Mrs. Silva's medical condition, her doctor recommends that she be under 24-hour supervision. Because Mr. and Mrs. Silva work and live together, Mr. Silva has been able to constantly monitor her medical condition. If they relocated to Brazil, they

would not have their shared business and would not be able to work together. In such a situation, Mr. Silva would not be able to provide Mrs. Silva with the constant observation her condition requires, putting Mrs. Silva's health at great risk. Therefore, Mrs. Silva would risk extreme physical hardship if she had to live in Brazil, a country where she could not be guaranteed the medication or observation necessary for her mere survival.

### MRS. SILVA SPEAKS NO PORTUGUESE AND OWNS HER OWN BUSINESS IN THE U.S.

Mrs. Silva has worked hard to establish her successful business. It has taken Mr. and Mrs. Silva five years to successfully build their business into the successful operation of three Italian restaurants located in the Bay Area. She would not be afforded similar opportunities in Brazil. Mrs. Silva does not speak Portuguese, and it would be very difficult for her to find work. Furthermore, according to the U.S. Department of State Country Reports on Human Rights Practices, the unemployment rate for women exceeds that for men by about 5%. According to Forbes, the overall unemployment rate in 2002 was 11.7%. The average annual income is US$3,000 (see attached Country Report), and for women just 67% of that. (See attached Country Reports on Human Rights Practices - 2002). If forced to move to Brazil, the Silva's could not maintain even their modest standard of living, nor realize their "American dream" of purchasing a home, and living there peacefully with their family. (See Dec.)

### MRS. SILVA IS CLOSE TO HER MOTHER AND SISTER IN THE U.S.

In addition, the U.S. citizen spouse's mother and sister reside legally in the U.S. Mrs. Silva provides support and companionship to her mother and sister. (See Dec.) Mrs. Silva states that she would be devastated if she had to choose between her career and her close relationships with her mother and sister (living without her husband for ten years) or moving to Brazil and forfeiting her career and extended family relationship so that she may have a continuing relationship with the applicant. Again, Mrs. Silva cannot afford to travel internationally to visit her family, nor can they afford to travel to the Brazil to visit her and her child. It would be emotionally devastating to Mrs. Silva to be separated from her family for 10 years. (See Dec.)

Mrs. Silva explains that if she were separated from her husband because of their mistake, she would be devastated. These economic, emotional, medical, cultural and additional factors discussed in the supporting materials (and which will be further discussed in additional materials to be submitted) cumulatively constitute extreme hardship to a qualifying relative, the applicant's U.S. citizen spouse.

### THE BALANCING OF EQUITIES SHOWS THAT MR. SILVA MERITS A FAVORABLE EXERCISE OF DISCRETION

It is a well-established principle of law and equity that "the punishment should fit the crime." In other words, the hardship showing needed for granting a waiver should be proportional to the conduct underlying the ground of inadmissibility, as well as the ground of inadmissibility itself. The balancing of favorable against negative factors is part and parcel of discretionary waiver adjudication. Thus, for example, hardship required for granting a waiver of inadmissibility for crimes of moral turpitude would be much greater than that required for unlawful presence.

Mr. Silva participated in a J-1 sponsored program between March 3, 1990 and September 19, 1991. Since the completion of his J-1 training program, Mr. Silva has been accruing unlawful presence.

In the interim, Mr. Silva married his U.S. citizen wife, opened three Italian restaurants, and had their daughter. Between November and December 2002, Mr. Silva went to Brazil to settle his late father's estate. His deceased father's farmland had been tied up in the Brazilian court system for five years, and Mr. Silva's presence was required in court to settle the matter.

Since there are no other negative equities in his case, the hardship to the U.S. citizen wife overwhelmingly outweighs the negative factors, and she deserves the favorable exercise of your discretion.

For all of these reasons (and those additional materials which will be provided within 30 – 60 days), we respectfully request that you grant the waiver, so that Mr. Silva may continue to live with his wife in the United States. Please do not hesitate to contact me if you have any questions or concerns.

Very truly yours,

James R. Mayock
Managing Partner

JRM:SZB:jd
Enclosures