STEVEN F. GRUEL (CSBN 213148)
655 Montgomery Street, Suite 1700
San Francisco, California 94111
Telephone Number (415) 989-1253
Fax Number (415) 576-1442
attystevengruel@sbcglobal.net

Attorney for Glenio Silva

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>Vs.<br><br>GLENIO JESUA FERREIRA SILVA,<br><br>  Defendant. | ) No. CR-07-00678-JSW<br>)<br>) DEFENDANT GLENIO SILVA'S<br>) REPLY TO THE GOVERNMENT'S<br>) OPPOSITIONS<br>)<br>) DATE: August 21, 2008<br>) TIME: 2:30 p.m.<br>)<br>) Excl. Time: 18 USC 3161(h)(1)(F)<br>)<br>) |

Defendant, Glenio Jesua Ferreira Silva, by and through his attorney, Steven F. Gruel, hereby submits this Reply to the Government's Oppositions.

## INTRODUCTION

The government opposes the defense motions seeking dismissal of the indictment and suppression of "evidence." In lieu of three separate replies, the defense with the Court's permission, submits this single pleading.

## MOTION TO DISMISS / SUPERVISORY POWERS OF THE COURT

Since the filing of Mr. Silva's motion to dismiss the indictment for selective prosecution, the powder keg created by the arbitrary enforcement of certain violations of the immigration law in this district ironically exploded.[1]  Around June 29, 2008 at least eight illegal aliens who were convicted crack dealers and provided sanctuary because of San Francisco's policy, were shielded from immigration detection, then transported in furtherance of their illegal status in the United States to southern California and, once reaching their destination, walked away to whereabouts unknown.  Further, since the parties were last before the Court, a criminal alien who was in this country illegally and safe-harbored from immigration detection under San Francisco's sanctuary status, committed three murders.  Not only did these events cause politicians to scramble, but the local newspaper kept digging to learn that in addition to shielding illegal immigrant felons from deportation, the Mayor's office gave grants totaling more than $650,000 to nonprofit agencies to provide criminal illegal aliens with free services - everything from immigration attorneys to housing assistance to "arts and cultural affirmation activities."[2]

---

[1] The defense requests that the Court take judicial notice of the facts mentioned regarding this matter. Within the last few months, the San Francisco Chronicle, San Francisco Examiner and national media have spotlighted this sanctuary city status. To further buttress the record, a few of the newspaper articles, certainly not all of them, are filed herewith.

[2] In 2006, the Mayor's Office of Criminal Justice - a community outreach arm of Newsom's office - created a grant program specifically designed to assist, rather than deport, "undocumented, unaccompanied and monolingual" immigrants who were in the custody of the city's Juvenile Probation Department or on juvenile probation, according to city documents. The City provided $467,000 to three nonprofit agencies under the grant program from mid-2006 and mid-2008, records show, and another $200,000 was approved for two of the agencies for this budget year. *San Francisco Chronicle*, August 3, 2008, attached as Exhibit A to Declaration of Steven F. Gruel

In the August 3, 2008 article appearing in the *San Francisco Chronicle*, the United States Attorney agreed with the point the defense noted months ago, **"What it means to me is they [San Francisco] took the concept of sanctuary, and they applied it in a way that it is as close to harboring as I've ever seen."**

While letters may have exchanged, comments made by officials for the newspapers, and a degree of finger-pointing, no federal charges have been filed.

Make no mistake, the defense is not saying or encouraging that charges be filed for the events outlined above. Nevertheless, from the government's detailed analysis in its other papers of what constitutes a violation of federal law for alien harboring and trafficking, charges clearly could be filed for the above federal crimes. Federal charges would likely create a political hornets' nest. But, avoiding political knots are no excuse or justification that serves to save the arbitrary filing of the charges in this case.

Mr. Silva is alleged to have hired 6 illegal aliens to work at two pizzerias. During this alleged employment there was:

1. **No Involuntary Servitude (this was not sweatshop);**

2. **No Human Trafficking (this was not the horrific crime of trading in humans);**

3. **No Other Criminal Activity (as with the crack dealers and violence seen above);**

4. **No Efforts to Avoid Immigration (as seen with the deliberate transporting of the crack dealers to a different location); and**

**5. The defense submits that the three material witness depositions have exculpated Mr. Silva.[3]**

The point to be made is simple. Prosecutorial discretion is wide but not unfettered. With United States v. Trimble, 487 F.3d 752 (9th Cir. 2007 ) as a foothold, and against the backdrop of the facts of this case, filed in this district where open public violations of the same federal laws occur with impunity, this Court should exercise its supervisory powers and dismiss this indictment. Federal prosecution of those suspected of harboring aliens in this district is clearly arbitrary government action. Fairness, and due process, requires no less.

## MOTION TO DISMISS INDICTMENT FOR INCORRECT MENTAL STATE

The defense reply is short. The government can reply upon the belief that because it tracked the statute that the indictment is not constitutionally infirm. That lesson was learned in United States v. Nguyen, 73 F.3d 887 (9th Cir. 1995). Although buried in the government's footnote, the law in this Circuit is clear. Alien harboring is a specific intent crime which requires that the "harboring" take place for the *purpose* of avoiding immigration detection. United States v. You, 382 F.3d 958 (9th Cir. 2004).

Given the government's position on what it believes is the correct mental state for alien harboring, it is therefore extremely certain that the Grand Jury was not instructed on the correct law in this Circuit when asked to return a True Bill on the indictment presented to them in this case. To make this determination, those transcripts should be either revealed to the defense, or at a minimum, provided to the Court *in camera* for review.

---

[3] The government incorrectly alleges that the defense went beyond the boundaries in one deposition and into areas of "discovery." Actually, the area of cross-examination was nothing more than simple impeachment of witness with another witness.

**MOTION TO SUPPRESS ALLEGED STATEMENT**

The defense reply makes a few points for the Court's consideration which support suppressing the statements to agent Brown.[4] First, after Mr. Silva clearly invoked, the government describes agent Brown's *questions* to Mr. Silva as only a mere *response* to Mr. Silva's observation "You guys want to get a terrorist? What's the point?"

Instead, agent Brown then *asked* Mr. Silva, whether he knew the rules about hiring people to work in the United States and whether this could be a problem for Mr. Silva. These questions, and Mr. Silva's response "yeah" were in violation of Miranda. Indeed, viewed another way, what do agent Brown's questions concerning Mr. Silvas's knowledge of hiring laws have to do with his observation that I.C.E. was interested in terrorists?

Finally, nothwithstanding that I.C.E's investigation into the employment practices of Mr. Silva extended over at least 4 to 5 months, the government attempts to save the comments made by Mr. Silva notwithstanding the self-imposed boundaries of topics by looking to *Websters' Third New International Dictionary*. The government exceeded the areas that it represented to Mr. Silva that it would question. Answers beyond those areas in which he wavied his rights should be suppressed.

Respectfully Submitted,

Dated: August 6, 2008

_____
STEVEN F. GRUEL
Attorney for Glen Silva

---

[4] The letters and documents in English are likely from Mr. Silva's immigration file. It is defense counsel's understanding that Mr. Silva had an attorney for his immigration matters which, of course, would explain the documents mentioned by the government.